The next argument this morning is Fayemi against Robinson. Good morning, Your Honor, this is Pat Paton on behalf of Adetokunbo Fayemi. This court granted a certificate of appealability to decide whether trial counsel was ineffective or breaking his promise to the jury that Mr. Fayemi would testify. And the answer to that question is that yes, counsel was ineffective for breaking that promise. First, there can be real no dispute that defense counsel did promise the jury that Mr. Fayemi would personally testify. The state court's opinion on the post-conviction appeal specifically finds that in two places, both in paragraph 34, which is on appendix page 86, and in paragraph 47 of the opinion, which is on appendix page 89. So the state court found as a matter of fact that defense counsel did promise that Mr. Fayemi would personally testify. And the transcript certainly bears that out. And in fact, defense counsel admitted that when he testified at the hearing on the motion for new trial. So there's no real dispute that defense counsel did in fact promise that Mr. Fayemi would personally testify. And of course, there isn't any dispute that Mr. Fayemi did not testify. And so this court has held that when a defense lawyer promises the jury that the defendant will personally testify, and then unreasonably breaks that promise by not calling the defendant, that that error is both objectively unreasonable and prejudicial to the defendant. The reason that defense counsel gave for not calling Mr. Fayemi — Mr. Patton, we may have some difficulty with multidirectional talk on this line. Anyway, this is Judge Easterbrook, and I have a central question for you about this line of argument, about what this court has held. The question is, does it matter what the Seventh Circuit has held, given that 2254d says that the writ can't issue unless the state court has either defied or unreasonably applied the decisions of the Supreme Court of the United States? No matter how highly we think about our own jurisprudence, we are not the Supreme Court of the United States. So why do our decisions matter? Well, Your Honor, first of all, when you have a standard like the Strickland v. Washington standard, which is firmly established Supreme Court case law, that a state court can unreasonably apply that case law or apply it in a way that's contrary to Supreme Court case law, even if the Supreme Court has not addressed the exact actual circumstance involved in the case. And that is a function of the broadly applicable, firmly established rule like in Strickland. So I do think that this court's case law is important in fleshing out what Strickland v. Washington — In what is prejudicial, in what is not. Are you familiar with Kiernan v. Cuerra, decision of the Supreme Court? The Ninth Circuit said roughly what you've just said. We can look at our circuit case law in fleshing out general standards. And it got summarily reversed in a decision that was, I think, quite harsh toward that approach. Is it something we should be doing in turn? Well, Your Honor, I am not familiar with that case. I have not read it. But what I will say is that in Williams v. Taylor, which we cite in the brief, when the Supreme Court is giving examples of what would be contrary to established Supreme Court case law, they use as an example the Strickland v. Washington standard. And they say that if a state court would apply the prejudice standard in a way that required the defendant to prove by preponderance of the evidence that without the unreasonable attorney performance, the case would be — the outcome would have been different. But that is an application of Strickland that's contrary to. I think if you limited Strickland v. Washington to exact attorney performance that was decided by the Supreme Court, then there would only be a few ineffective assistance to counsel cases you could ever win. Because the Supreme Court has established the Strickland v. Washington standard. It doesn't have to take cases to further flesh out what that standard means. And so I do think that, at least specifically in this case, given the fact that the Illinois Appellate Court applied Strickland in a manner that is contrary to Strickland by misapplying the prejudice standard, then there is clearly articulated Supreme Court case law on point that allows this court to reverse. Because the Illinois Supreme Court, every time it laid out the prejudice standard, set it out in terms that required Mr. Fahey to establish that the outcome of this proceeding would have been different. And the court never fully articulated the prejudice standard by explaining that a reasonable probability is a probability sufficient to undermine confidence in the outcome. Mr. Patton, it's Judge Stoddard. Let me ask you a question about that. So when I read the Illinois Court of Appeals post-conviction relief opinion, I think you accurately describe it to one extent. But the Court of Appeals does a couple of things that I'd like you to react to. One, they cite the prior decision in Peeple v. Evans. And there's no question that Peeple v. Evans accurately outlines, you know, in a very literal way, the full dimension of the Strickland pronto prejudice inquiry. And then second, I'd like your reaction to this. It sure seems to me that it's a substantive matter that the Illinois Court of Appeals, when it transitions into the application of fact to that standard, was clearly applying the right law. In other words, they were looking at the strength of the case against your client and in substance asking whether the evidence was so strong that anyone reasonably could have had their confidence shaken in the outcome. Your Honor, the opinion certainly cites Evans. But then what I would point out, Your Honor, if you looked at paragraph 48 of the opinion, which starts on page 89 of the appendix and goes over to 80, excuse me, 90, the court talks about ineffective assistance in the context of defense counsel breaking a promise to call the defendant. And they cite Peeple v. Winkfield. And where they say, quote, the test is not whether defense counsel fulfilled every promise made during opening statements, but whether any error by counsel was so grave that had the error not occurred, the result of the case would likely have been different. And that is not the right standard. That's not the prejudice standard as articulated by the Supreme Court because that in no uncertain terms says that in this context we're only going to find prejudice. Mr. Patton, you have a minute and 15 seconds to go. Okay. So, Your Honor, and if you follow Winkfield back, they end up citing, he gets back to citing a case, Peeple v. Schlager. That's not quoted in the briefs, but it's 617 Northeast 2nd, 1275. And that's 1283. And that's the first time I can find this statement about counsel's performance in breaking a promise to the jury about the defendant testifying. And it says the result of the case would likely have been different. And so it is our position that the Illinois Appellate Court did apply this one's prejudice on contrary to the Supreme Court's case law. And I've reserved the rest of my time. Good morning. Thank you, Mr. Patton. Ms. Cascio. Thank you, Your Honor. Good morning. I am Gopi Kashyap on behalf of respondents. As Judge Sutter just pointed out, the state court's decision was not contrary to Strickland. This court's decisions in Woods v. Schwartz, Stanley v. Bartley, and Sussman v. Jenkins are dispositive on that question. In those cases, the court found that the state court's decisions were consistent with Strickland, even though the state courts had used a shorthand recitation of the prejudice standard later when evaluating the claim. And that's because the state courts had at the outset correctly articulated the Strickland prejudice standard by stating that petitioner needs to show a reasonable probability of a different outcome. Those cases never focused on the inclusion or exclusion of the undermined confidence in the outcome definition of a reasonable probability. And, in fact, those three cases didn't even cite or quote that language in the opinions at all. And as Judge Sutter pointed out, here the state court cited to Strickland, it correctly articulated the standard, and it cited to Evans. And in Evans, the court actually set forth the entire standard, which includes the undermined confidence in the outcome standard. And then the state court applied the correct analysis. And so we must give the state courts the benefit of the doubt, and 2254G applies here. Applying 2254D, the evidence against petitioner was incredibly stressful, and there is no reasonable probability of a different outcome here. As Judge Easterbrook pointed out, the Supreme Court has never said that broken promises are per se prejudicial or prejudicial at all, and the courts never addressed the question. So when we look at the evidence in this case, and we look at the effect of the broken promise on the jury, it is clear that petitioner was not prejudiced. The evidence shows that this was not an accident. Everyone who clustered around Alice and ate food and drink at her home and at the hospital suffered from thallium intoxication. Alice's levels were exceedingly high and potentially lethal. She fell into a coma. Even the other victims had levels five to six times the normal amount. But what's telling here is that petitioner, her fiancé, his levels were normal, and they were consistent with someone who had worked with thallium. And that aligns with the evidence that was found in petitioner's home, which confirms this was not an accident. Petitioner had used 60% of the thallium sulfate that he had purchased, and he had put that thallium in various forms in six other containers across his home, and most tellingly into his kitchen in a salt shaker, in a glass bottle found in a spice cabinet, and in liquid form in a pill bottle, demonstrating that this wasn't an accident and that petitioner used the toxin on food and drink. There was additional evidence that demonstrated his intent in the absence of mistake. Petitioner had a history of using deadly chemicals and losing control in a relationship, and he had learned from his past experiences to avoid detection, he ordered the odorless, tasteless toxin that, when ingested in small doses, causes symptoms that mimic hundreds of other diseases. Petitioner's accidental poisoning theory also failed to explain how Cortez McNutt, Alice's nephew, was poisoned. Cortez consumed nothing from Alice's home, and instead only drank juice that Petitioner had supplied him at the hospital. Alice, therefore, could not have accidentally poisoned Cortez, just like she did not accidentally poison herself and the rest of the victims. Ultimately, putting everything together, the evidence against Petitioner was both extensive and compelling, and there's no reasonable probability that the jury based its verdict on some negative inference from the broken promise, rather than the overwhelming evidence of guilt. Ms. Kyshop, it's Judge Scudder. I want you to react to one observation that I had. I was surprised in Part 2 of your brief on page 38 to see you try to defend what defense counsel did here. Oh, on the deficiency? Yeah, on Strickland Prawn 1. I must say that I think Mr. Patton has the better of that argument, perhaps by a long shot. And if for no other reason, how in the world can a defense lawyer commit to his client testifying in a case like this, with evidence like this out there, or that's going to come in at trial, and most especially against the backdrop of the pretrial ruling, that if the Petitioner chose to testify, that into evidence would come the books and the papers found in his apartment, discussing how to kill somebody with poison? Well, so there's a couple points, Your Honor. One, this is a case where Petitioner insisted on testifying, and the record bears that Petitioner was a fairly difficult client to— Go back to, if I may, please focus on my question. Against the backdrop of what happened pretrial, and the strength of the evidence that you just quite ably outlined, how in the world can this be defended on Prawn 1? I know why you want to get to Prawn 2, and I would do that too. But it did surprise me to not see your brief end on page 37. Well, the trial evolved in certain steps. Yes, so in the pretrial ruling, the trial court had actually admitted the evidence of the books and notes that were in Petitioner's home. I'll note that on the very first day of trial, before opening statements, the trial court says specifically that Petitioner—that the state would be allowed to introduce, in its case in chief, the prior bad acts evidence from Rutan's home, specifically the cyanide in the five food items, including an assault shaker and two seasoning containers, as well as his criminal trespass. I don't want to hang you up on this. It sounds like just from your response that you're not prone to disagree with the observations I've made. No, I think counsel was in a tough spot, and so he had a lot of evidence against— there was a lot of evidence against Petitioner. He wanted to pursue a different theory, which was to point to deliberate poisoning by Petitioner's girlfriend. He was dating two women at the same time, Alex and this other woman, Maria Johnson, and Petitioner rejected that. And so they went to an accidental poisoning theory. And we have to remember that on deficiency, we still do look at the course of representation, and counsel here, throughout the entire course of representation, was reasonable. He continuously objected to evidence that the trial court had said would come in. He was so successful even before trial and even during trial, and he did the best that he could. And ultimately, he had to make a choice, and we have to look at both when the promise was made as well as when the promise was broken. Because the question is whether counsel unreasonably broke the promise. And so here at the time that counsel broke the promise, he was stuck with having excluded very damaging evidence during the course of trial and advising Petitioner based on what happened during trial. And so applying the appropriate deference, we do think that counsel was not constitutionally deficient within the meaning of the Sixth Amendment. But, of course, this case ends, in our opinion, on prejudice as the state court reasonably found that there was no prejudice from counsel's broken promise. If the court has no further questions, we ask the court to affirm the district court's judgment. Thank you, counsel. Mr. Patton, I think you had about 30 seconds left. Thank you, Your Honor. Your Honor, I would just say in Holland v. Jackson, the Supreme Court said that a state court can kind of get the benefit of the doubt with the quote-unquote shorthand statement of prejudice when the complete Strickland standard is elsewhere recited. And I don't think that was done here, and if you apply that shorthand exception too broadly, then you're getting to the point where the state court – you could never find the state court applied it contrary to established law. And I would end on that, Your Honor. Thank you very much. The case is taken under advisement.